IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 18-cv-02266-PAB-NYW

JAIME LONGORIA,
ABIGAIL RATCHFORD
ANA CHERI,
EMILY SEARS, and
LUCY PINDER,

      Plaintiffs,

v.

MILLION DOLLAR CORPORATION d/b/a Dandy Dan's a/k/a Dandy Dan's Gentlemen's
Club,

      Defendant.

_____

**ORDER**
_____

This matter is before the Court on Defendant's Motion to Strike Opinions of

Plaintiffs' Expert Stephen Chamberlin [Docket No. 56], Defendant's Motion to Strike

Opinions of Plaintiffs' Expert Martin Buncher [Docket No. 57], and Plaintiffs' Motion to

Strike the Expert Report and Testimony of Michael Einhorn, Ph.D. [Docket No. 58].

The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND

Defendant owns and operates a strip club located in Denver, Colorado.  *See*

Docket No. 5 at 5, ¶¶ 18-19.  Plaintiffs are models, actresses, and social media

personalities.  *See id.* at 4-5, ¶¶ 11-17.  In an effort to promote its business, defendant

posted several images of plaintiffs on its media platforms, such as its website, Twitter

page, Instagram account, and Facebook page.  *See id.* at 2-3, ¶ 4.  Plaintiffs are not

employed by defendant, are not affiliated with defendant, and do not endorse defendant. *Id.* at 3, ¶ 5. Plaintiffs neither gave defendant permission to use their images to promote defendant's business nor were paid for the use of their images on defendant's various platforms. *See id.* at 3-4, ¶¶ 6-7.

On August 31, 2018, plaintiffs filed suit. *See* Docket No. 1. In their amended complaint, they assert one cause of action for violation of the Lanham Act, 15 U.S.C. § 1125(a), for false advertising and false endorsement. *See* Docket No. 5 at 16. The parties now move to exclude the reports and testimonies of various experts retained by each side. *See* Docket Nos. 56-58.

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area. Rather, the Court must "perform[] a two-step analysis." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After determining whether the expert is qualified, the proffered opinions must be assessed for reliability. *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods,"

2

and reflect a reliable application of "the principles and methods to the facts of the case").

In ruling on a Rule 702 motion, the district court has a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"  *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93).  Where an expert witness relies on experience, the expert "'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'"  *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes).  When examining an expert's method, however, the inquiry should not be aimed at the "exhaustive search for cosmic understanding but for the particularized resolution of legal disputes."  *Daubert*, 509 U.S. at 597.  It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant.

In addition to the witness having appropriate qualifications and methods, the proponent of the witness's opinions must demonstrate that the process by which the witness derived his or her opinions is reliable.  *United States v. Crabbe*, 556 F. Supp.

2d 1217, 1220 (D. Colo. 2008).  "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Rule 702 requires that expert testimony be "helpful[] to the trier of fact."  *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991).  "[C]onclusory opinions, which require blind acceptance of the expert's *ipse dixit*, are never helpful."  *Huang v. Marklyn Grp. Inc.*, No. 11-cv-01765-REB-BNB, 2014 WL 3559367, at *5 (D. Colo. July 18, 2014).  Instead, expert testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods," and the expert must "reliably appl[y] the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)-(d).  "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.*

While the proponent of the challenged testimony has the burden of establishing admissibility, the proffer is tested against the standard of reliability, not correctness, *see Allstate Sweeping, LLC v. City & Cty. of Denver*, No. 10-cv-00290-WJM-MJW, 2011 WL 2173997, at *3 (D. Colo. June 2, 2011); the proponent need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied."  *Crabbe*, 556 F. Supp.

2d at 1221.

## III.  ANALYSIS

### A.  Defendant's Motion to Strike Stephen Chamberlin

Defendant moves to exclude Stephen Chamberlin's opinions regarding his damages valuations for each of the remaining plaintiffs.  *See* Docket No. 56. Specifically, defendant argues that Mr. Chamberlin's valuation is not reliable and is not based on sufficient facts or data.  See *id.* at 12.  Defendant does not dispute that Mr. Chamberlin is qualified to make a valuation as to the claims at issue.  *See id.*

Mr. Chamberlin has been an agent in the modeling industry since 1989 and has represented over 5,000 models in his career.  *See* Docket No. 56-1 at 4.  He has worked at several talent agencies, and is the current owner and director of a "model sourcing and management company."  *Id.*  Plaintiffs retained Mr. Chamberlin "to examine the pecuniary damage to the [plaintiffs] arising from the use and/or alteration of their images, likenesses[,] and identities" by defendant and "evaluate and value retroactively the compensation [p]laintiffs would and should have received for the use of their images."  *Id.* at 5.  To do this, Mr. Chamberlin offers his opinions on each plaintiff's "day rate," fair market value of the photographs, and the total damages to each plaintiff.

 Under § 1125 of the Lanham Act, there are "two distinct bases of liability," false association and false advertising.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).  To succeed on a false advertising claim, a plaintiff must show: "(1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in

commerce; (3) that are either likely to cause confusion or mistake as to [] the origin, association or approval of the product with or by another . . . ; and (4) injure the plaintiff." *Digital Ally, Inc. v. Utility Assocs., Inc.*, 882 F.3d 974, 978 (10th Cir. 2018).  A plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising."  *Lexmark*, 572 U.S. at 133.  In other words, a plaintiff must provide evidence of "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  *Id.* at 140.  In a false association claim, a plaintiff "alleges the misuse of a trademark, i.e., a symbol or device such as a visual likeness, vocal imitation, or other uniquely distinguishing characteristic, which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product."  *See Amazon Inc. v. Cannondale Inc.*, No. 99-cv-00571-EWN-PAC, 2000 WL 1800639, at *7 (D. Colo. July 24, 2000).  Under either theory, a plaintiff will be entitled "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  *See* 15 U.S.C. § 1117(a). Without showing damages or profits, plaintiffs cannot recover under § 1125.  *See id.*; *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 525 (10th Cir. 1987) ("[T]o recover damages[,] plaintiff must prove it has been damaged by actual consumer confusion or deception resulting from the violation[;] [l]ikelihood of confusion is insufficient.").

Before addressing Mr. Chamberlin's opinions, the Court notes that defendant fails to identify a generally accepted methodology to which Mr. Chamberlin's opinions and methods should be compared.  Typically, to demonstrate that an expert's methodology is unreliable, the moving party must explain what is an appropriate and

6

reliable methodology; without doing so, a court has nothing to judge the challenged expert's methods against.  *See Crabbe*, 556 F. Supp. 2d at 1222 ("The requirement that an opinion be derived from reliable principles or methods, known colloquially as 'methodology,' involves two related inquiries: (i) what methodology did the witness use to reach the opinion; and (ii) is that methodology generally deemed 'reliable' in the field in which the expert works.").  Nevertheless, a lack of a comparison does not automatically doom a reliability challenge if a defendant can show that, even without this comparison, the expert's methodology is unsupported and inconsistent.  For example, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146.

Mr. Chamberlin's report states that his opinions are based on a review of the images posted on defendant's media platforms and based on discussions with plaintiffs, agency representatives, and others in the modeling and talent industry.  *See* Docket No. 56-1 at 5.  To calculate the fair market value of defendant's use of plaintiffs' photographs, Mr. Chamberlin "attempt[ed] to recreate a negotiation process that did not occur" between plaintiffs and defendant and, as a result, his fair market value determination "takes into consideration factors normally considered by talent, clients[,] and their respective agents."  *Id.*  He considers "the status of the [m]odels, the nature of the use and true harm to the [m]odels in not being able to control the way in which [the] image[s] [were] used."  *Id.* at 6.  Mr. Chamberlin states that a model's compensation is typically a "day rate," which is "the base rate of compensation" for a "[m]odel's time on

the day of shoot." *Id.* at 10.  Generally, a number of factors go into this day rate, such as desirability, brand, number of social media followers, work history, such as prior associations and endorsements, and the nature of the business wanting to use the model.  *Id.*  Other factors may be considered as well, such as exclusivity, the sensitive subject matter of the product or service, exposure, usage of the image, and nature, duration, and location of the shoot and product.  *Id.* at 11.  In determining each plaintiff's day rate, and thus fair market value of defendant's use, Mr. Chamberlin states that he considers the plaintiff's modeling contracts, 1099 forms, W-2s, and earning statements.  *Id.* at 13.

While these general considerations may demonstrate the appropriate components that a reliable method would apply to place a value on the plaintiffs' images, Mr. Chamberlin's individual calculations demonstrate that his opinion on each plaintiff's day rate is untethered from the data and simply *ipse dixit*.  Mr. Chamberlin firsts calculates Jamie Longoria's day rate.  *See id.* at 19.  He notes that Ms. Longoria was Playboy's Playmate of the Month in January 2010, was a sports blogger for Playboy online and co-host of Fantasy Sports Radio, and has been on "numerous [] television, print, radio[,] and online outlets."  *Id.*  Mr. Chamberlin considers these points, as well as that Ms. Longoria: (1) is a "full time wife and mother," (2) has, at one point, had a day rate of $25,000, (3) was a contestant on The Amazing Race, and (4) is married to a Major League Baseball player.  *Id.* at 20.  Then, without explaining how these factors combine into his day rate calculation, other than to say, in several places, it is "difficult to place a numerical valuation" on a particular factor, Mr. Chamberlin

opines that Ms. Longoria has a day rate "at a *minimum*" of $20,000.  *See id.* at 27.  He then proceeds to multiply that day rate by three to generate his opinion regarding the fair market value of the photograph.  *See id.*  This multiplier includes: (1) "advertising," which Mr. Chamberlin considers to be the price of associating defendant with Ms. Longoria's image; (2) the posting of the image on social media; and (3) "branding," which Mr. Chamberlin defines as language implying that Ms. Longoria would be at defendant's club.  *Id.* at 28.

There are two flaws in Mr. Chamberlin's analysis.  First, the only actual financial data Mr. Chamberlin uses to calculate the day rate is from a contract with Playboy from over a decade ago, even though he states that a proper calculation should consider a number of financial documents, like a W-2 or 1099.  *See id.* at 13, 21-23.  The Playboy contract, however, involved significantly more components than the single posting of Ms. Longoria's photo on defendant's social media account.  In addition to the photo shoot, the Playboy Contract required Ms. Longoria (1) be available to promote and produce both "Playmate of the Month" and "Playmate of the Year"; (2) participate in filming sessions for both of those titles; (3) be available for "additional still photography or filming sessions" for Playboy's international magazines, websites, and calendars; (4) make "up to 20 days of promotional appearances during the month your issue of the magazine is on-sale," five of which would include no additional compensation; (5) participate in a one-hour online chat while the issue was on-sale; and (6) "make personal appearances and tours at Playboy's request in this country and elsewhere," which would include additional compensation and expenses.  *See id.* at 21-23.  Mr. Chamberlin thus primarily relies on one contract that paid Ms. Longoria $25,000 for all

9

the above requirements far beyond her time for a single photo shoot, which, according to Mr. Chamberlin, is what a day rate is meant to compensate.  *See id.* at 10 (stating that a "day rate" is compensation for the "[m]odel's time on the day of shoot").  Mr. Chamberlin fails to explain how this involved contract with Playboy reliably demonstrates that Ms. Longoria's day rate is at a "minimum" of $20,000 and, significantly, that this day rate reasonably corresponds to Ms. Longoria's damages from an unauthorized posting of an image on defendant's social media account.  *See Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) ("[W]hen the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion."); *Crabbe*, 556 F. Supp. 2d at 1222 (noting that a "subjective, conclusory approach" may be unreliable).

Second, even assuming that Mr. Chamberlin's calculation of Ms. Longoria's day rate was "based on sufficient facts or data," Fed. R. Evid. 702(b), there is no indication, based on the facts and data Mr. Chamberlin used, that the day rate should be multiplied by three for a single posting of the image.  Again, the only monetary or contractual information that Mr. Chamberlin relies on is Ms. Longoria's 2009 Playboy contract.  *See* Docket No. 56-1 at 21-23.  For $25,000, Ms. Longoria was required to attend multiple photography "sessions," promotional events related to Playboy of the Month, several "filming sessions," "additional still photography or filming sessions" for Playboy outlets beside Playboy Magazine, five promotional appearances, and "at least one one-hour

online chat." *See id.* at 21.  Yet, somehow, for a posting of an image on a social media account, Mr. Chamberlin states that Ms. Longoria is entitled to nearly three times the amount she received for the Playboy contract.  Mr. Chamberlin fails to explain his methodology, whether his methodology is generally accepted by experts in the field, and why his results are reliable.  The Court finds that there is "simply too great an analytical gap between the data and the opinion proffered" by Mr. Chamberlin regarding Ms. Longoria's day rate and fair market value of her image.  *See Joiner*, 522 U.S. at 146.

Mr. Chamberlin's opinions for the remaining plaintiffs are unreliable for the same reasons.  For Abigail Ratchford, Mr. Chamberlin says her day rate is, at a minimum, $20,000.  *See id.* at 44.  He bases this on her Snapchat single post fee of $5,000, a calendar year of sales totaling $120,000, a contract for $25,000 per month for two Instagram posts and three Snapchat stories a day, $10,000 a month in subscription downloads, and other subjective factors, such as desirability, based on his experience. *Id.*  Yet, not a single one of these contracts offers $20,000 for a single photo that requires no additional work on behalf of Ms. Ratchford.  The closest related contract is Ms. Ratchford's social media agreement, which pays her $25,000 a month.  *See id.* at 32-37.  But that contract requires 100 Instagram posts a month and 20 Snapchat stories a month, each of which must be at least 10 seconds in length.  *Id.* at 33.  Her social media rates are $500 for a permanent Instagram post, $3500 for a 24 hour Instagram post, $1200 for an Instagram story, and $5000 for a Snapchat.  *See id.* at 39. At one point, she earned a calendar year's worth of sales for over $120,000.  *See id.* at

11

44.  But never did Ms. Ratchford earn close to $20,000 in a single day for a single photo.  There is thus too much of an analytical gap between the data Mr. Chamberlin relies on and his $20,000 day rate opinion.  The *ipse dixit* nature of Mr. Chamberlin's calculation is evidenced by the multiplier he uses.  He calculates that each use of the photo is $60,000 – far exceeding Ms. Ratchford's social media contract for 100 photos and 20 stories or her social media rates – for a total of $420,000.  *Id.*  This number is completely out of proportion to Ms. Ratchford's yearly salary, let alone the rates for her social media posts.

For Ana Cheri, Mr. Chamberlin quotes her day rate at $50,000.  He primarily relies on a Playmate Agreement with Playboy from 2015.  *See id.* at 48.  That agreement requires Ms. Cheri to participate in a compensation-free "test shoot."  *Id.*  If selected as Playmate of the Month, Ms. Cheri would be paid $20,000.  *See id.*  She then would be required to participate in several "still photography session(s)," as well as production and publicity.  *See id.*  Mr. Chamberlin also includes a contract where Ms. Cheri would be paid $15,000 a month for posting on Instagram at least eight times per month.[1]  *Id.* at 49.  Mr. Chamberlin also includes "reimbursements for costs" that total $69,887.66, but it is unclear if these are earnings or reimbursements as the email states.  *Id.* at 50.  Even if they are earnings, they are for a month's worth of work, not a single day.  Nowhere in Mr. Chamberlin's report is there information demonstrating that Ms. Cheri earns anywhere near $50,000 for a day rate, and Mr. Chamberlin fails to connect this day rate to the damages Ms. Cheri incurred for defendant's posting of the

---

[1] Mr. Chamberlin only includes the first page of this five page contract, making it unclear what additional obligations Ms. Cheri may have had.

image.  And, again, Mr. Chamberlin multiples this day rate, which is purportedly meant to include all the work that goes into a photo shoot and the subsequent posting of photos from that shoot, times three for *each* photo, meaning that Mr. Chamberlin quotes Ms. Cheri's damages at $150,000 for each photo and a total value of $300,000, a number far exceeding even the most lucrative of Ms. Cheri's contracts that Mr. Chamberlin relies on.  *See id.* at 54.  Mr. Chamberlin's opinion on Ms. Cheri's damages is thus untethered from the data he uses and therefore unreliable.

The same issues occur for Emily Sears and Lucy Pinder.  For Ms. Sears, Mr. Chamberlin quotes a day rate of $10,000.  Yet, all of the supporting documentation shows nothing close to $10,000 for a day of work.  The closest is a proposal, not even a signed contract, for Ms. Sears to attend a music festival, with corresponding events and social media posts.  *See id.* at 57.  The festival was two days long, and Ms. Sears was to be paid $8,000.  *Id.*  Mr. Chamberlin also includes, without any context, several payments to Ms. Sears, all significantly under $10,000.  *See id.* at 58.  Mr. Chamberlin himself says that Ms. Sears only makes $10,000 to $20,000 a month, *id.* at 60, yet somehow, without explanation, quotes her day rate at $10,000.  There is nothing connecting the data Mr. Chamberlin relies on to this day rate, and nothing connecting this day rate to the damages Ms. Sears incurred for defendant's posting.  And, again, without explanation, he multiplies this day rate times three, quoting the fair market value of defendant's posting at $120,000, a number no where near any of Ms. Sears' previous engagements.

Mr. Chamberlin quotes Ms. Pinder's day rate at $20,000.  He relies on a 2007

13

contract where Ms. Pinder was paid £60,000 for a single photo shoot with NUTS Magazine, a 2008 agreement where she was paid £75,000 for work on a twenty-two day, 24-hour a day reality TV show program, and a £10,000 a month contract which includes an unknown amount of work.  *See id.* at 77, 81-82.  Other than the NUTS Magazine contract, which is over 15 years old, Mr. Chamberlin relies on no documentation demonstrating that Ms. Pinder has ever earned $20,000 for a day, let alone that she would ever earn $20,000 for a single photograph.  Mr. Chamberlin also multiplies this number by three, meaning that Mr. Chamberlin is quoting the value of defendant's posting of the single photo at $60,000, without any explanation as to why that number should be multiplied.  *See id.* at 87.

For all of Mr. Chamberlin's opinions regarding plaintiffs' damages, Mr. Chamberlin purportedly relies on data demonstrating the plaintiffs' day rate, but none of that data is remotely tied to Mr. Chamberlin's calculation.  In many cases, the data directly refutes Mr. Chamberlin's final valuation, as demonstrated by the fact that his opinion regarding each plaintiffs' damages for a single photo significantly exceed any prior compensation for work that required more involvement on behalf of the plaintiff. *See Electra v. 59 Murray Enters., Inc.*, – F.3d –, 2021 WL 438900, at *15 (2d Cir. 2021) (holding that Mr. Chamberlin's methodology "resulted in calculations of damages amounts far greater than the actual amount Appellants received for the photographs in the first instance" and "systematically overestimated the fair market value of the photographs at issue").   Moreover, Mr. Chamberlin fails to explain why that day rate is an appropriate measure for the posting on a social media account and why that number should be multiplied by three.  As a result, the Court finds that Mr. Chamberlin's

14

opinions as to plaintiffs' damages "simply do[] not follow from the data," *Bitler*, 400 F.3d at 1233, and, therefore, are unreliable.  Thus, Mr. Chamberlin's damages, day rate, and fair market value opinions will be excluded.[2]

### B.  Motion to Strike Martin Buncher

Martin Buncher is a marketing consultant who plaintiffs retained to create a consumer confusion survey.  Docket No. 57-9 at 5.  Defendant moves to strike Mr. Buncher's survey and expert report.  *See* Docket No. 57.  Specifically, defendant argues that Mr. Buncher's survey is flawed and, as a result, the Court should exclude (1) his consumer confusion survey and (2) his opinion that defendant's use of the plaintiffs' photos caused or is likely to cause consumer confusion.  *See id.* at 3, ¶ 6.

Mr. Buncher has been the managing director of a marketing investigations firm since 1977.  *See* Docket No. 57-9 at 6.  His clients range from the aerospace industry to healthcare products.  *See id.*  He has been providing "marketing research and marketing consulting services for 54 years."  *Id.*  Plaintiffs retained Mr. Buncher to conduct a survey "to explore possible confusion among consumers exposed to" defendant's advertising, which utilized plaintiffs' images.  *Id.* at 5.  To succeed on both a false advertising and false association claim, a plaintiff must show a likelihood of

---

[2] Plaintiffs cite a single case where a court found Mr. Chamberlin's methods to be reliable.  *See* Docket No. 86-1 at 10.  There, the court found that Mr. Chamberlin based his day rate "on a rate the Models have been paid before, appears grounded in verifiable facts, and is not speculative."  *See Edmondson v. Caliente Resorts, LLC*, 2017 WL 10591833, at *6 (M.D. Fl. Aug. 31, 2017).  But the court does not discuss in detail what numbers and what contracts Mr. Chamberlin used in that case.  *See id.*  Were Mr. Chamberlin's damages calculation here to be "grounded in verifiable facts," his damages opinions might be reliable.  *See id.*  But, as already explained, the facts Mr. Chamberlin relies on do not support his calculations.

confusion between the use of the "mark," in this case the photograph, and the sponsorship, endorsement, or approval of the product to which the mark is attached. *See Digital Ally,* 882 F.3d at 978; *Amazon*, 2000 WL 1800639, at *7. While likelihood of confusion is sufficient to make out a claim under § 1125, it is insufficient to recover damages. To recover damages, a plaintiff must show actual confusion. *Brunswick*, 832 F.2d at 525.

While a party may utilize a survey to demonstrate consumer confusion, the survey's evidentiary value depends on the methodology used and the questions presented to respondents. *See University Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1534 n.3 (10th Cir. 1994). "Although methodological flaws in a confusion survey will typically affect only the survey's weight and not its admissibility, these flaws may justify exclusion under Rule 702 if they are serious and pervasive enough." *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1246 (10th Cir. 2013) (citations omitted). In a consumer confusion survey, if they flaws are serious and pervasive enough, they render the expert's opinions drawn from the survey unreliable because the survey cannot serve as the basis for the expert's conclusions. *See Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 864 n.8 (10th Cir. 2008). Moreover, if a survey's flaws lead to results that lack any probative value, the Court may exclude the survey as irrelevant. *See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1145 (10th Cir. 2013) (affirming district court's conclusion that methodological flaws in a consumer survey rendered the survey's results "devoid of any probative value and therefore irrelevant").

Mr. Buncher's survey was designed "to measure the degree of confusion which may have been created" by the use of plaintiffs' photos "relative to their acting as spokespeople representing the brand, endorsing the brand, and participating in the activities at the Clubs and/or life style represented . . ., and/or being otherwise affiliated or associated with the brand." Docket No. 57-9 at 7. The survey used representative ads "accompanied by a series of closed and open-end questions relating to the respondent reactions to the advertising, and their demographics." *Id.* A total of "eight ads each showing different women were tested among 606 respondents selected from the metropolitan area surrounding the Club location among a random sample of adult men and women, 21 years and older." *Id.* at 8. There was a 50/50 gender split. *Id.*

After showing four ads, the survey asks the following open-ended questions: (1) "what is the first thing that comes to mind," (2) "what else comes to mind," and (3) "what feelings or emotions do you have as you look at these ads?" *Id.* at 61. Next, the survey asks how "important" the women in the ads were in terms of "initially attracting your attention to the ads," an open-ended question of what message the ad is trying to impart, and how "important" the women in the ads are to that message. *See id.* at 62. After that, the survey asks a series of questions regarding affiliation with and endorsement of defendant: whether (1) the women in the ads "have some" or "do not have any" affiliation with the club; (2) the women "have agreed" or "have not agreed" to "sponsor, endorse, or promote the club in these ads"; (3) the women "approve" or "do not approve" of the use of their image in the ad; (4) the women "probably do not enjoy" or "probably enjoy" a "lifestyle" reflected in the club ads; (5) the women "probably do not participate" or "probably do participate" in the events or activities which take place in the

17

club; and (6) the women "were not paid" or "were paid" to be in the ads.  *Id.* at 62-64.

The survey then showed an ad with women and without women and asked respondents

to indicate which is more likely to make the respondent interested in visiting the club

and assign a percentage to that number.  *See id.* at 64-65.  Finally, the survey asked

respondents if they identified the woman in the ad, with a "yes" or "no" answer.  *Id.* at

65.

The Court finds that Mr. Buncher's survey suffers from flaws that render it

inadmissible.  First, Mr. Buncher includes women who are not plaintiffs in this case

without any explanation, *see id.* at 44-45, 46, 54 (including images of Carmen Electra,

Claudia Sampedro, and Megan Iglesias), and his analysis of the data does not account

for the fact that non-plaintiffs might have been identified by respondents.  For example,

Mr. Buncher opines that the "average" level of recognition was 15%.  *See id.* at 25.  But

since that average takes into account women who are not plaintiffs, it is irrelevant for

determining the level of confusion among viewers of *plaintiffs*' images.  Mr. Buncher

agrees, stating that "[t]o compare . . . what other female images communicated is not

relevant."  *See id.* at 10.  Yet, even though Mr. Buncher states that other women are

irrelevant and non-probative of consumer confusion, he nevertheless includes them,

and fails to account for responses including those other women.  A simple

mathematical equation demonstrates the flaw in doing this: if a survey included eight

photos, three of which were famous presidents and five of which were random

strangers, a recognition rate of zero percent for all of the strangers but 75% for all of the

presidents still results in an average recognition rate of 28%.  In other words, that a

respondent recognized Carmen Electra is unrelated and irrelevant to the question of whether a respondent recognized a plaintiff in this case.  This flaw extends to all the questions in Mr. Buncher's survey.  Because Mr. Buncher included photographs of non-plaintiffs, each question provides data that, in Mr. Buncher's own words, is "not relevant" to the lawsuit.  *Id.*  Given that a § 1125 claim requires showing a likelihood of confusion, and actual confusion to obtain damages, demonstrating confusion regarding other women is unhelpful and non-probative of the operative legal question.  Moreover, Mr. Buncher did not even apply his own methodology; although he stated he should not include photos of other women, he did anyway.  *See Crabbe*, 556 F. Supp. 2d at 1221 (noting that an expert must reliably apply his own methodology).  This flaw is pervasive, as it applies to every question in the survey, and serious, as it undermines the value of the survey's conclusions.  As a result, this error is sufficient on its own to justify exclusion.  *See 1-800 Contacts*, 722 F.3d at 1246.

Second, although Mr. Buncher's survey is causal, he fails to include a control group.  According to the Judicial Reference Guide on Survey Research, a guide on which Mr. Buncher relies, a causal survey is designed "to determine the source of [] attitudes and beliefs or behaviors."  *See* Shari Seidman Diamond, *Reference Guide on Survey Research* 397 (Fed. Jud. Ctr. 3d ed. 2011).  Because these surveys look to what causes a certain belief, attitude, or behavior, they "test a causal proposition" and are thus causal surveys.  *Id.*  Mr. Buncher opines that his study is not causal.  *See* Docket No. 57-9 at 11 ("As the purpose of this research is not the test of a causal proposition, but rather a communications or descriptive study, there is no need for a

control group.").  However, the Court is not persuaded.  According to the Reference

Guide on Survey Research, a causal survey determines the source of particular beliefs

or attitudes.   Diamond, *Reference Guide on Survey Research,* at 397.  Mr. Buncher's

survey does just that.  It attempts to discern whether defendant's use of plaintiffs'

images was the source of confusion regarding whether plaintiffs endorsed, sponsored,

or took part in defendant's business.  Indeed, the survey questions get right to that

issue: the survey asks whether the women in the ads agreed to take part, whether they

endorse defendant, and whether they have an affiliation with defendant.  *See* Docket

No. 57-9 at 62-64.  The survey's own questions belie Mr. Buncher's attempt to

characterize this survey as anything other than causal.  As does Mr. Buncher's opinion

that the survey demonstrates "confusion and false communication surrounding ideas

relating to the women's role in the material."  *Id.* at 25.  And Mr. Buncher himself states

that the survey was designed "to measure the degree of confusion which may have

been created by the use of eight women."  *Id.* at 7.  Mr. Buncher's use of "created,"

rather than "caused" or "source," does not transform the survey from a causal survey to

a descriptive one.

A causal study, however, requires a control group.  As the Reference Guide on

Survey Research states, control groups work to ensure that "causal inferences . . .

become clear and unambiguous."  *See* Diamond, *Reference Guide on Survey*

*Research*, at 398.  McCarthy on Trademarks and Unfair Competition agrees, stating

that a control isolates "noise" in the survey.  J. Thomas McCarthy, 6 McCarthy on

Trademarks and Unfair Competition § 32:187 (5th ed.).  Noise is statistically irrelevant

information that can result from situations like a respondent always selecting yes, or guessing "because they are bored or hurried." *Id.* This might result in "false positives arising from something other than the particular confusion that is alleged and that the survey aims to capture." *See Water Pik*, 726 F.3d at 1148 (citing 6 McCarthy on Trademarks and Unfair Competition § 32:187). "[A] survey control is always necessary to pin down causation: whether survey responses in fact reflect the thing the survey is designed to prove, whether it is secondary meaning or that the accused mark causes confusion or some other issue." 6 McCarthy on Trademarks and Unfair Competition § 32:187. "To isolate confusion arising specifically from the contested mark, survey designers will substitute for the contested mark a control that shares as many characteristics with the contested mark as possible." *See Water Pik*, 726 F.3d at 1148. In other words, without a control group, Mr. Buncher cannot demonstrate that the "survey responses in fact reflect the thing the survey is designed to prove," in this case, that defendants' use of the photos caused confusion regarding plaintiffs' endorsement or sponsorship of defendant's business. *See* 6 McCarthy on Trademarks and Unfair Competition § 32:187.

Although "less common," a survey may use a control question, as opposed to a control group. *See* Diamond, *Reference Guide on Survey Research*, at 401. "Rather than administering a control stimulus[3] to a separate group of respondents, the survey asks all respondents one or more control questions along with the question about the

---

[3] Stimulus is a word for what is being shown to the survey respondents, such as a commercial or photo. *See id.* at 363-64 n.13.

product or service at issue."[4]  *See id.*  Mr. Buncher's control question showed the survey respondents two ads, one with an image of a woman and one without an image of a woman.  *See* Docket No. 57-9 at 64-65.  The survey then asked the respondent to identify which ad would make him or her more likely to attend the club.  *Id.*  Mr. Buncher's control question, however, is flawed.  First, the question explicitly stated that the images were the same, except one had the images of the women removed.  *See id.* Another court, relying on the Reference Guide for Survey Research, found this raised reliability issues with another of Mr. Buncher's surveys that used the same control question: "By expressly stating that the second image is identical absent the presence of the [p]laintiff, the survey alerted respondents that the identity of the [p]laintiff was the variable being measured and defeated the purpose of a control question."  *See Edmondson v. RCI Hosp. Holdings, Inc.*, 2020 WL 1503452, at *7 (S.D.N.Y. Mar. 30, 2020) (citing Diamond*, Reference Guide on Survey Research*, at 399-400).  "A survey question that begs its answer by suggesting a link . . . cannot be a true indicator of the likelihood of consumer confusion."  *Water Pik*, 726 F.3d at 1147.  Without a control question or a control group, which is "always necessary to pin down causation," Mr. Buncher's survey says nothing regarding the likelihood or actual confusion caused by defendant's use of plaintiff's images. *See* 6 McCarthy on Trademarks and Unfair Competition § 32:187 (5th ed.).

---

[4] For example, in determining whether there is consumer confusion between "The Mart" and "K-Mart," a control question asked whether "The Mart" and "King's Department Store" were owned by the same people.  *See id.*  This question probes the baseline level of confusion by determining what percentage of people might be confused regardless of the precise mark at issue.  *See id.*

Third, many of the questions in the survey "are not directed at the relevant issues in a false endorsement claim." *Toth v. 59 Murray Enters., Inc.*, 2019 WL 95564, at \*9 (S.D.N.Y. Jan 3, 2019), *aff'd in relevant part*, *Electra*, – F.3d –, 2020 WL 438900, at \*19.  Respondents believing that the plaintiffs in the photos agreed to promote defendant or be in the ads "may demonstrate that the advertisements are impliedly false . . . [but they] do not speak to recognition or endorsement." *Id.*  Additionally, that use of plaintiffs' photos made respondents more interested in defendant's club is irrelevant to whether respondents recognized plaintiffs and/or believed that plaintiffs endorsed defendant.  *See id.*

Taken together, these flaws "are serious and pervasive enough," *1-800 Contacts*, 722 F.3d at 1246, to justify the exclusion of Mr. Buncher's survey and opinions regarding the confusion caused by defendant's posting of plaintiffs' images. Mr. Buncher's results include information regarding endorsement and recognition of non-plaintiffs, he fails to include a control group or an adequate control question, and his survey does not probe the relevant questions in a false endorsement or advertising claim.  As a result, Mr. Buncher's opinions that stem from the survey – that defendant's use of the photos caused or is likely to cause consumer confusion – are unreliable because the source of his opinions, the survey, is flawed.  *See Vail Associates,* 516 F.3d at 864.  Furthermore, because the survey includes irrelevant information, fails to account for background noise, and does not answer the relevant legal questions, it provides no probative information and is irrelevant to plaintiffs' claims.  *See Water Pik*, 726 F.3d at 1146.  Therefore, the Court will exclude Mr. Buncher's survey and his

opinions that defendant's use of the photographs caused or is likely to cause consumer confusion.

### C.  Plaintiffs' Motion to Strike Michael Einhorn

Plaintiffs move to strike "all opinions and testimony of [d]efendant's proposed expert, Michael Einhorn." *See* Docket No. 58 at 1.  However, the Court's Practice Standards require that "[t]he motion shall identify with specificity each **opinion** the moving party seeks to exclude."  Practice Standards (Civil cases), Chief Judge Philip A. Brimmer § III.G.  Nevertheless, the motion clearly directs its attention to Mr. Einhorn's fair market value, day rate calculation, and rebuttal of Mr. Chamberlin's report.  *See, e.g.*, Docket No. 58 at 9 ("Einhorn's unsophisticated and untenable so-called methodology here . .  underscore[s] . . . that Einhorn engaged in no meaningful or reliable analysis of the fair market value of Plaintiffs' images.").  Defendant, however, acknowledges that Mr. Einhorn's "role is limited to that of a rebuttal expert" and states that, if Mr. Chamberlin's opinion regarding the fair market value of plaintiffs' damages is excluded, "then there is no need for Dr. Einhorn to testify as to his own market valuation, as the testimony would not be relevant to any determination at that point." *See* Docket No. 73 at 6, 9, ¶¶ 19, 28.  The Court construes this as a concession that, if Mr. Chamberlin is precluded from testifying regarding his damages calculation, then defendant will not seek to introduce Mr. Einhorn's report or have him testify.  The Court has already excluded these portions of Mr. Chamberlin's report and testimony.  As a result, plaintiffs' motion to strike Mr. Einhorn is denied as moot.  If Mr. Einhorn's testimony again becomes relevant, plaintiffs will be given the opportunity to file another

motion to exclude Mr. Einhorn's report and testimony.

## IV.   CONCLUSION

Wherefore, it is

**ORDERED** Defendant's Motion to Strike Opinions of Plaintiffs' Expert Stephen

Chamberlin [Docket No. 56] is **GRANTED**.  It is further

**ORDERED** Defendant's Motion to Strike Opinions of Plaintiffs' Expert Martin

Buncher [Docket No. 57] is **GRANTED**.  It is further

**ORDERED** that Plaintiffs' Motion to Strike the Expert Report and Testimony of

Michael Einhorn, Ph.D [Docket No. 58] is **DENIED** as moot.

DATED March 2, 2021.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge